Filed 2/22/23

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTOPHER JAMES KENNEY,<br><br>    Defendant and Appellant. | D079227<br><br><br>  (Super. Ct. Nos. SCE391690,<br>SCE399634, SCE404172) |

APPEAL from judgments of the Superior Court of San Diego County, Patricia K. Cookson, Judge. Affirmed as modified.

Matthew A. Lopas, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Collette C. Cavalier, Nora S. Weyl and Maxine Hart, Deputy Attorneys General, for Plaintiff and Respondent.

A temporary (21-day) domestic violence restraining order (DVRO), issued ex parte, is designed to prevent an imminent threat of domestic violence.  Yet, the exigency that justified issuing it without notice may also require police to enforce it before the restrained person has been served with the order.  To keep the peace while at the same time affording due process, Penal Code[1] section 835, subdivision (c) provides that a law enforcement officer may enforce a DVRO after verifying it exists and orally informing the restrained person of its "contents."  (*Id.,* subd. (c)(2).)

In this case, when Christopher James Kenney was inside his mother's home in violation of a temporary DVRO that had not yet been served, Sheriff's deputies yelled through a locked bedroom door, "There's a restraining order on file, Christopher" and "You're not allowed to be here." Christopher's terse reply, "Break my fucking door down, dude.  This is my fucking house" was prescient.  Deputies forced the door open and after a scuffle arrested him.

Kenney was not charged with violating the temporary DVRO, but instead with resisting an executive officer.  (§ 69.)  The fundamental issue on appeal is whether deputies acted lawfully, which in turn depends on whether they gave Kenney sufficient notice of the restraining order's "contents."  We hold they did and affirm Kenney's conviction.

FACTUAL AND PROCEDURAL BACKGROUND

On January 5, 2021, Kenney's mother, C.K., was deeply concerned about her 29-year-old son's drug addiction.  Hoping he would voluntarily enter residential treatment if forced to move out from her home, she obtained

---

[1]    Undesignated statutory references are to the Penal Code.

2

an temporary DVRO.[2]  Pending a hearing 15 days later, the court ordered Kenney to "take only personal clothing and belongings needed until the hearing and move out immediately."  In an accompanying order, the San Diego County Sheriff was directed to "remove" Kenney from the residence.

The next day, C.K. told Kenney, " 'I have a restraining order.  You need to move.' "  She did not show him the order, nor did anyone serve him with it.  But Kenney complied.  On January 6, he put his belongings in his car and drove off.

Two days later, however, Kenney returned early in the morning.  C.K. asked, "What are you doing here?" and said, "You know you could be arrested."  After replying, "Fuck you," he went into his bedroom.  He told his mother he would leave after taking a shower.  The timing was bad.  C.K. had to drive her grandson to school.  She told Kenney, "That's not how restraining orders work," and promised they would "talk" when she returned.

C.K. never had a chance to have that conversation.  As soon as she left, her boyfriend, Richard R., called police to report "a disorderly druggie" who was "loaded to the gills" and "not supposed to be on the property."  He told the dispatcher there was a "restraining order out" but "it hasn't been served" and "he's here for you to get him right now."

By the time C.K. returned, deputies had already arrived.  She gave them a copy of the temporary DVRO.  They also checked with their "records" division to confirm its validity.  C.K. told deputies Kenney had not yet been served with it.

Kenney was inside his locked bedroom, which connects to a bathroom.  Initially, deputy Evan Maldonado told Kenney he would not be arrested, but

---

[2]  Whether there were sufficient grounds for issuing a temporary DVRO is not before us in this case.

needed to come out so they could serve him with the temporary DVRO. But when Kenney refused to open the door, he and deputy Brett Germain had the following conversation with Kenney through the closed door:

> "[Germain:] There's a restraining order on file, Christopher.
>
> "[Maldonado:] You're not allowed to be here, buddy.
>
> "[Kenney:] I'm not allowed to be in my own house?
>
> "[Germain:] Correct.
>
> "[Maldonado:] Yes, you are absolutely correct. So come out.
>
> "[Kenney:] (Unintelligible) in my own fucking house. You're tripping, bro.
>
> "[Maldonado:] No, we're not tripping. You're the one that needs to come out.
>
> "[Kenney:] No, I don't. This is my fucking house, dog.
>
> "[Maldonado:] You're not allowed here anymore.
>
> "[Kenney:] This is my house." [¶] . . . [¶]
>
> "[Germain:] As of right now you're not going to be under arrest, we're gonna serve you with the restraining order.
>
> "[Kenney:] This is bullshit. Fuck you guys.
>
> "[Maldonado:] Chris, you're not allowed to be here. Come on, we'll talk about it. Serve you with your paperwork and you can get going.
>
> "[Kenney:] Break my fucking door down, dude. This is my fucking house.
>
> "[Germain:] Okay."

C.K. did not have a key to unlock the bedroom door. She told deputies that in the past she had opened it by sliding a credit card along the door

jamb.  To avoid having to break down the door, deputies used a piece of flexible plastic, but it took multiple tries and several minutes to work. Finally, the latch opened.  As the door began to open the door, Kenney (who stands 6'1" tall and weighs 180 pounds) pushed hard against it from the inside.  The door suddenly slammed shut, momentarily catching Maldonado's finger.[3]  Several minutes later, deputies successfully forced the door open again, and after a scuffle arrested Kenney.[4]

Kenney was charged in a one count information with resisting an executive officer with force (§ 69).  The court also instructed the jury on the lesser included offense of resisting, obstructing, or delaying a peace officer (§ 148, subd. (a)).  After the jury was unable to reach a unanimous verdict on the charged count, the prosecutor amended the information to charge (as count 2) a violation of section 148.  The jury convicted Kenney on that count, and after the court declared a mistrial on count one, it dismissed that charge in the interests of justice.[5]

## DISCUSSION

A.  *The Trial Court Correctly Denied Kenney's Motion to Dismiss*

This appeal turns not on Kenney's conduct, but on that of the deputies. This is because to convict on either count, the jury would have to find that Maldonado was "performing his lawful duty."  (See CALCRIM Nos. 2652, 2656.)

---

[3]  Maldonado had "significant pain" in his hand for "a couple of days" but did not require medical attention.

[4]  The jury viewed recordings of these events taken by body worn cameras.

[5]  Kenney's misdemeanor conviction had more serious consequences because it violated the terms of his probation in two unrelated cases.

Section 836 authorizes a peace officer to arrest a person who has violated a DVRO where the officer "has probable cause to believe that the person against whom the order is issued has notice of the order." (§ 836, subd. (c)(1).) Under subdivision (c)(2) of section 836, a person who has not been served with a DVRO is nevertheless "deemed to have notice of the order" if "informed by a peace office of the contents of the protective order."

After the prosecution rested, Kenney's attorney moved for dismissal under section 1118.1.[6] He maintained that because Kenney was not served with the order nor notified of the January 20, 2021 hearing date, "[T]here was just a complete flattening of his right to notice and due process . . . ." Opposing the motion, the prosecutor asserted, "The deputies tell him through the door, 'There's a restraining order. You cannot be here.' [¶] And he asked them, . . . 'So you are telling me I am not allowed to be in my own house.' And they said, 'Yes, that's correct.' "

The trial court denied the motion to dismiss. On appeal, Kenney essentially repeats the arguments he made in the trial court. He claims that as a matter of law, the deputies acted unlawfully because the temporary DVRO "had never been lawfully noticed or served."

In determining whether the trial court correctly denied the section 1181.1 motion, the standard of review is the same as that used when evaluating whether the evidence was sufficient to sustain a conviction. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) Here, substantial evidence

---

[6] Section 1118.1 provides in part: "In a case tried before a jury, the court on motion of the defendant . . . at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

6

supports the trial court's ruling. The body worn camera video shows that after announcing, "Sheriff's department," deputies repeatedly asked Kenney to open the door. About six minutes later a deputy other than Maldonado can be heard saying, "I'm looking at the restraining order now."[7] About one minute later, Maldonado and Germain spoke with Kenney through the closed bedroom door. Kenney was informed, "You're not allowed to be here," and when Kenney replied, "This is my house," deputies told him, "There's a restraining order on file, Christopher," and "You're not allowed to be here, buddy."

The obvious purpose of the notice requirement in section 836 is to afford the restrained person a meaningful opportunity *at the scene* to conform his or her conduct to law. In this case, for example, Kenney needed to be informed that the temporary DVRO contained a move-out order.

Of course, the temporary DVRO in this case contains several other provisions as well. For instance, it required Kenney to stay away from C.K.'s grandson. It also set a hearing date in 21 days. At some point, Kenney needed to be informed of these things too. But given the volatile events unfolding at C.K.'s home, that could wait. Kenney barricaded himself in a home the court had ordered him to vacate.

We give a practical interpretation to the peace officer's obligation to inform the restrained person of "contents of the protective order" under section 836, subdivision (c)(2). The conduct that is (allegedly) violating the restraining order will define the contours of the information that must be disclosed. For example here, to conform his conduct at the scene to the requirements of the temporary DVRO, Kenney needed to be informed of the

---

[7]    Maldonado testified that he did not read the temporary DVRO.

move-out order. But he did not need to know about the hearing in 21 days, or that he was also prohibited from being in contact with C.K. or her grandson.

The body worn camera video would support, if not compel a finding that deputies adequately informed Kenney of the contents of the temporary restraining order within the meaning of section 836, subdivision (c)(2). Therefore, the trial court correctly denied the motion to dismiss.

In urging a different conclusion, Kenney maintains that "[u]nder section 836, subdivision (c)(2), simply informing the restrained person that there is a restraining order and that they must leave constitutes insufficient 'notice.' " But he does not explain why that should be the result. He cites no authority to support that claim, nor is the argument developed with analysis of the statutory language or its purpose.

In a related argument, Kenney asserts that his "awareness of the order was uncertain" because (1) C.K. had threatened him some 20 other times that she had a restraining order, and she did not show him the order "to demonstrate that this time was different," (2) Maldonado did not read the temporary DVRO, and (3) and no one actually showed the restraining order to Kenney.

Defense counsel was certainly entitled to argue that something important was omitted when deputies advised Kenney of the "contents" of the temporary restraining order. But the question on appeal from the denial of a section 1118.1 motion is not whether the evidence could support a verdict in the defendant's favor, but instead whether "in light of all the evidence, a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt." (See *People v. Gomez* (2018) 6 Cal.5th 243, 278.) Here, there is substantial evidence that even if Maldonado himself did not read the DVRO, deputy Germain did. He is heard on the body worn camera recording

8

saying, "I'm looking at the restraining order now." (Cf. *Beier v. City of Lewiston* (9th Cir. 2004) 354 F.3d 1058, 1069 [a police officer who does not personally read a restraining order may "fulfill his duty by obtaining information from authorized personnel—such as a supervisor or police dispatcher—who have access to the terms of the order"].) Germain informed Kenney, "There's a restraining order on file," and immediately after that, Maldonado said, "You're not allowed to be here, buddy." We conclude, therefore, that the trial court correctly denied the section 1118.1 motion because there was substantial evidence from which a jury could conclude beyond a reasonable doubt that law enforcement informed Kenney of the material contents of the temporary DVRO.

B.  *The Trial Court Had a Sua Sponte Obligation to Instruct the Jury on Notice Under Penal Code Section 836, but Its Failure to Do so Was Not Prejudicial*

The crux of the trial was whether deputies acted lawfully, which in turn depended on their compliance with the notice provisions in section 836, subdivision (c). But for reasons unexplained on this record, during the conference on jury instructions neither side asked the court to instruct on that point. Nor did the court itself raise the issue. As a result, the jury was instructed that to convict it must find that Maldonado was "performing his lawful duty"—but it was given no guidance on how to make that determination.

Exploiting this void, in closing argument defense counsel told the jury, "there absolutely was a duty to serve him with a copy—a physical copy, a printed copy of the restraining order." Elaborating, counsel argued:

9

> "And so it has been the defense position from the very beginning that they could have been only lawfully performing their duties in the context of this case if Mr. Kenney had been served with a copy of the restraining order, a physical copy of the restraining order."

Not surprisingly, the prosecutor's closing argument was quite different. Reading from the temporary DVRO, which quotes section 836, subdivision (c)(2), the prosecutor argued that the deputies acted lawfully because they advised Kenney of its material terms.

After about an hour of deliberations, the jury sent a note to the court asking, "*Does Defendant have to comply if orders were not served or seen by Defendant?*" (Italics added and capitalization omitted.) A concise and correct answer would have been—"Yes, if the defendant was informed by a peace officer of the contents of the protective order." (See § 836, subdivision (c)(2).) But instead, the court met with the lawyers and proposed responding with: "[T]he court cannot answer your question." Kenney's lawyer indicated he "was satisfied" with that nonanswer.[8] But after reading section 836, subdivision (c)(1) and (2) to the trial judge, the prosecutor disagreed, stating:

> "The People's position would be, it's up to the jury to determine whether or not he was informed by the peace officer of the contents of the protective order as an issue of fact. And that the jury should be instructed as to what the law is."

The court rejected the prosecutor's argument and replied to the jury's note with: "The court cannot answer your question."

---

[8] In closing argument he had already told the jury the opposite—i.e., that without service on Kenney, deputies acted unlawfully in attempting to enforce the temporary DVRO.

10

On appeal, Kenney contends the trial court had a sua sponte obligation to instruct the jury on the notice provisions of section 836, subdivision (c). As explained below, we agree.

Even absent a request, in a criminal case a trial court must instruct on " ' "the general principles of law relevant to the issues raised by the evidence. [Citation.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary to the jury's understanding of the case." ' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 708.)

Here, to convict on either count, the jury would have to find that the deputies were engaged in the lawful performance of their duties. (See *People v. Williams* (2018) 26 Cal.App.5th 71, 82; *People v. Rodriguez* (2012) 207 Cal.App.4th 1540, 1543.) Because it was undisputed that Kenney was not served with the temporary DVRO, the deputies were engaged in the lawful performance of their duties if Kenney "was informed by a peace officer of the contents of the protective order." (§ 836, subd. (c)(2).)

"To perform their job properly and fairly, jurors must *understand* the legal principles they are charged with applying. It is the trial judge's function to facilitate such an understanding." (*People v. Thompkins* (1987) 195 Cal.App.3d 244, 250.) Here, the jury's question—"does [Kenney] have to comply if orders were not served or seen by [him]"—convincingly shows that although neither the court nor counsel appreciated the need for instructions on the pivotal issue in the case, the jury did.

Whether the trial court had a sua sponte obligation to give an instruction embodying the issue of notice under section 836 is not a close call. The entire case turned on it. Indeed, after closing arguments but before submitting the case to the jury, the trial judge stated, "[T]his case is about

11

notice and knowledge of the temporary restraining order . . . .  I mean this whole case is about that."

The Attorney General attempts to argue that the trial court had no obligation to instruct on section 836 because "defense counsel made no request" for it.  However, "[s]ince the trial court's duty to instruct fully on the relevant legal theories is not dependent upon counsel, error in omitting required instructions cannot be waived by a party simply by the failure of its counsel to demand the instructions." (*People v. Wickersham* (1982) 32 Cal.3d 307, 334–335, overruled on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 200–201.)

The Attorney General also maintains that an instruction patterned on section 836, subdivision (c) would have been a "pinpoint" instruction and "courts need not give pinpoint instructions sua sponte."  But pinpoint instructions "relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case, such as mistaken identification or alibi." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.)  The omitted instruction here, which would have elucidated an essential element of the charged offenses, is not a pinpoint instruction.  Indeed, in the trial court, it was the *prosecutor*— not defense counsel—who asked that it be given.

Nevertheless, although the trial court erred by failing to so instruct, we also conclude the error was harmless beyond a reasonable doubt.  The standard form temporary DVRO contains a section entitled, "Instructions for Law Enforcement," which quotes portions of section 836, subdivision (c).  In closing argument, the prosecutor read this to the jury, stating:

> "This is a court order.  It's very clear on this piece of paperwork, dated January 5th, 2021, signed by a judge, filed January 5th, 2021.

12

"What does it say on the order itself? And you are going to get this. You can read it yourself. It says right here . . . . [¶] 'This order is effective when made.'

"Here's the instructions for law enforcement. [¶] 'It is enforceable by any law enforcement agency that has received the order, is shown a copy of the order . . . . *If the law enforcement agency has not received proof of service on the restrained person . . . the agency shall . . . advise the restrained person of the terms of the order and then shall enforce it.*' " (Italics added.)

Then, based on this as the applicable law, the prosecutor told the jury:

"The question is going to become[,] did the defendant have notice[?] I submit to you, absolutely, he had notice . . . . [¶] The mom comes home. She testified . . . that she spoke to her son, says, 'You need to move out because I got a restraining order on you.' [¶] What does he do? He moves out. . . .

"And then the deputies tell him. And that's on tape. You heard it on tape. They are telling him, 'There's a restraining order, you can't be here.' "

Thus, the prosecutor informed the jury that the deputies acted lawfully if they advised Kenney of the "terms of the order"—i.e., the "contents." (See § 836, subd. (c)(2).) Of course, this is not a legally sufficient substitute for the court's failure to instruct. But the fact the prosecutor correctly defined this concept ensured the jury was given the proper legal standard—and that is a factor in the harmless error analysis. (See *People v. Visciotti* (1992) 2 Cal.4th 1, 58–59 [court's failure to instruct that an intent to kill is an element of attempted murder, harmless beyond a reasonable doubt where prosecutor in closing argument stated that in attempted murder there must be express malice and intent to kill]; *People v. Champion* (1995) 9 Cal.4th 879, 949 [trial

13

court's failure to sua sponte instruct was harmless error where in closing argument the prosecutor informed the jury of the correct legal standard].)

Based on the prosecutor's argument, the fact that the correct legal standard was printed on the temporary DVRO (which the jury had as a trial exhibit), and the body worn camera evidence showing exactly what deputies told Kenney, the trial court's instructional error was harmless beyond a reasonable doubt.

C.    *Under Recent Statutory Changes, the Remaining Unpaid Balance of the $154 Criminal Justice Administration Fee Is Vacated*

In an unrelated case filed in 2019 (case No. SCE391690), Kenney pled guilty to resisting an executive officer by use of force.  He was placed on formal probation for three years.  The court also imposed various fees and fines, including a $154 criminal justice administrative fee.

In a case filed in 2020 (case No. SCE399634), Kenney pled guilty to unlawfully taking and driving a vehicle.  The court suspended execution of sentence for three years, granted probation, and released Kenney to participate in a residential drug treatment program.

After his conviction here in 2021, the trial court sentenced Kenney for the misdemeanor conviction as well as for violating probation in the 2019 and 2020 cases.

After Kenney's sentencing, Government Code section 6111 became operative.  It provides that the unpaid balance of the criminal justice administrative fee is unenforceable and any portion of a judgment imposing those costs "shall be vacated."  (*Id.*, § 6111, subd. (a).)

Kenney contends  the Attorney General concedes, and we agree that the judgment in case number SCE391690 should be modified to vacate the unpaid balance of the criminal justice administration fee.

14

## DISPOSITION

The judgment in case number SCE391690 is modified to vacate the unpaid balance of the $154 criminal justice administrative fee, and as so modified is affirmed.  The superior court shall modify the abstract of judgment accordingly and forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgments are affirmed.


DATO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DO, J.

15